# IN THE SUPREME COURT OF THE STATE OF IDAHO
## Docket No. 42092

LA BELLA VITA, LLC, an Idaho limited
liability company,

    Plaintiff-Appellant,

v.

AMANDA SHULER and EIKOVA SALON
AND SPA, LLC, an Idaho limited liability
company,

    Defendant-Respondent,

and

CASSIE MOSER, BRITNEY
HARRINGTON, KORTNI ELLETT,
JARA DALEY, and EMILY COFFIN,

    Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Idaho Falls, May 2015 Term

2015 Opinion No. 65

Filed: July 13, 2015

Stephen W. Kenyon Clerk

---

Appeal from the District Court of the Sixth Judicial District of the State of
Idaho, Bannock County. Hon. Robert C. Naftz, District Judge.

The district court's grant of summary judgment is <u>reversed</u>. This case is <u>remanded</u>
for further consideration consistent with this Opinion. The award of fees and costs to
respondent is <u>vacated.</u>

Maguire Law, P.C., Pocatello, attorneys for appellant. David Maguire argued.

Racine, Olsen, Nye, Budge & Bailey, Chtd., Pocatello, attorneys for respondent.
Lane V. Erickson argued.

---

W. JONES, J.

## I. NATURE OF THE CASE

This is a misappropriation of trade secrets case arising out of a dispute between two
competing businesses providing spa and salon services in Pocatello, Idaho, La Bella Vita, LLC

(La Bella Vita) and Eikova Salon and Spa, LLC (Eikova). In February 2011, a number of employees left their employment at La Bella Vita to open Eikova, a new salon nearby. La Bella Vita brought suit alleging that these employees took its confidential client information to create and promote Eikova. After conducting discovery, La Bella Vita voluntarily dismissed all of the defendants except Amanda Shuler and Eikova, as well as all of the claims except the violation of the Idaho Trade Secrets Act and breach of the confidentiality agreement. On motion by the remaining defendants, the district court granted summary judgment against La Bella Vita on these remaining issues. La Bella Vita appeals the district court's decision to strike a supplemental brief offered in opposition to summary judgment, and also argues that disputed issues of material fact should have precluded the entry of summary judgment.

## II. FACTUAL AND PROCEDURAL BACKGROUND

Candy Barnard-Davidson (Davidson) is the owner and founder of La Bella Vita. Davidson started La Bella Vita in 1998 and has owned it to the present day. The individually named defendants in this action, Amanda Shuler (Shuler), Cassie Moser (Moser), Britney Harrington (Harrington), Kortni Ellett (Ellett), Jara Dalley (Dalley), and Emily Coffin (Coffin), are all former employees of La Bella Vita. While employed there, they held the following titles: Shuler was a Hair Stylist, Salon Manager, Co-Manager, and Trainer; Moser was a Hair Stylist; Harrington was a Hair Stylist; Ellett was a Front Desk Receptionist; Dalley was Front Desk Receptionist; and, Coffin was a Receptionist and Front Desk Manager. These individuals left their employment with La Bella Vita in mid-February 2011 to work for Eikova, a new spa and salon founded by Shuler. The circumstances of this collective departure give rise to this action.

Shuler and the other individually named defendants gave their notice of termination to Davidson in early February and left their employment with La Bella Vita on or about February 16, 2011. At the time of their joint departure, they constituted approximately half of La Bella Vita's employees. On February 22, 2011, Shuler opened Eikova for business at a location just around the corner from La Bella Vita. Eikova immediately began servicing clients, including some customers who were previously regular patrons of La Bella Vita.

On January 23, 2013, La Bella Vita filed suit in district court alleging that Shuler and the other defendants took protected or confidential information from La Bella Vita which they used to create and promote Shuler's new business, Eikova. In addition to the individual defendants, Eikova was named as a defendant in the action. Specifically, La Bella Vita alleged that these

2

former employees wrongfully took and used its confidential client lists, calendars, scheduling lists, client contact information, and other information regarding products, services, and client preferences in the creation and promotion of Eikova. The defendants jointly answered the complaint on March 8, 2013, denying the allegations and raising affirmative defenses.

None of the defendants signed a non-compete agreement in favor of Davidson or La Bella Vita; however, all but one of the individually named defendants[1] signed a "Confidentiality Agreement" whereby they promised to keep certain information confidential. Confidential information was defined in the agreement as including the following:

> [La Bella Vita's] trade secrets and confidential or proprietary information, such as client lists, client prospect material, price lists, rate structures, client service records, salon appointment books, payroll information, sales and profit data, marketing strategies and information, chemical information and formulas and any other information of a technical, financial or business nature that is unique to [La Bella Vita] and/or provides [La Bella Vita] with a competitive advantage in the marketplace. Confidential information does not include any information or material that is generally known by the public.

On July 31, 2013, Shuler and the other defendants jointly moved for summary judgment on all claims alleged in the complaint.[2] La Bella Vita timely opposed this motion, and oral argument was heard by the district court on October 7, 2013. At the outset of this hearing, however, La Bella Vita conceded that all of the defendants except Shuler and Eikova should be dismissed from the action. Given this oral representation, as well as La Bella Vita's written opposition to the summary judgment motion, the district court dismissed Moser, Harrington, Ellett, Dalley, and Coffin from the suit. In addition, La Bella Vita represented to the court at the hearing that only two issues remained in the action, an alleged violation of the Idaho Trade Secrets Act (ITSA) and an alleged breach of the confidentiality agreement signed by Shuler as a condition of her employment at La Bella Vita. As such, the court dismissed the remaining claims set forth in the complaint. For these reasons, the summary judgment hearing focused only on these two claims against the remaining defendants, Shuler and Eikova.

---

[1] Every defendant except Coffin signed the "Confidentiality Agreement."

[2] La Bella Vita failed to include in the appellate record the underlying moving papers and memoranda in support of, and in opposition to, the summary judgment motion, the transcript of the hearing on the same, and a related motion to strike supplemental briefing offered in opposition to summary judgment. Therefore, the facts surrounding these filings and the arguments advanced are derived from the register of actions and the district court's recital in its memorandum decision and order granting summary judgment against La Bella Vita. *Gibson v. Ada Cnty.*, 138 Idaho 787, 790, 69 P.3d 1048, 1051 (2003). La Bella Vita did include in the record, however, the affidavits filed in support and opposition of the summary judgment motion.

At the conclusion of the summary judgment hearing, La Bella Vita requested an opportunity to supplement the record with certain outstanding discovery items. Shuler and Eikova did not object to this request, so long as no additional briefing or argument would be submitted by La Bella Vita. La Bella Vita agreed to this condition and represented that no additional argument would be offered. On the issue of supplementation, the court ruled from the bench, permitting the submission of the outstanding discovery materials while cautioning the parties that additional argument would not be considered. The court explained that the motion would be taken under advisement as of the date the supplemental items were received.

On October 21, 2013, the district court received the additional information, which included Shuler's outstanding discovery responses, Eikova's business formation papers filed with the Secretary of State, as well as an affidavit from La Bella Vita's attorney. In addition, La Bella Vita filed a document entitled, "Supplemental Brief in Opposition to Motion for Summary Judgment." In response, Shuler and Eikova moved the court to strike the supplemental brief, arguing it violated both the rules governing summary judgment and also the court's ruling memorializing the agreement between the parties that no additional argument would be provided or considered. For the reasons outlined in greater detail below, the court struck the supplemental brief, as well as affidavits filed in response to the motion to strike.

Turning to the substance of the summary judgment motion, and after receiving and reviewing the outstanding discovery items, the district court addressed the two claims that remained in the operative complaint, an alleged breach of the confidentiality agreement and an alleged violation of the ITSA. La Bella Vita argued that Shuler and Eikova violated the ITSA and confidentiality agreement in two ways: one was the wrongful use of a "baby shower list," and the other was the improper accessing of La Bella Vita's official client list. The district court went through the affidavits offered in support of, and in opposition to, summary judgment and found that La Bella Vita failed to demonstrate the existence of a "trade secret" under the ITSA, and that even if some of the disputed information could conceivably qualify as confidential, there was no evidence to establish that Shuler actually took or used any of the allegedly confidential information in the creation of Eikova's client list.

In granting summary judgment, the district court rejected La Bella Vita's argument that the only way Eikova's client list could have been composed was through the misappropriation of La Bella Vita's confidential client list. Specifically, the court found that the affidavit testimony

4

offered in support of the motion sufficiently described the alternative and independent methods and sources used to generate Eikova's client list, and that La Bella Vita provided only conjecture, assumptions, and beliefs, not evidence, in opposition to this affidavit testimony. The district court further declared that the finding of no trade secret dispensed of the second issue, breach of confidentiality agreement. Without a trade secret, the district court reasoned that there could be no breach of the confidentiality agreement. For these reasons, the court granted summary judgment on the two remaining claims in favor of Shuler and Eikova.

On November 27, 2013, La Bella Vita filed a motion entitled "Motion to Amend or Alter Decision on Summary Judgment."[3] La Bella Vita brought its motion on four grounds, specifically Rules 11(a)(2)(B), 52(b), 60(b), and 61 of the Idaho Rules of Civil Procedure. Shuler and Eikova opposed this motion, oral argument was heard on January 13, 2014, and the district court took the matter under advisement at the conclusion of the hearing. The district court entered a memorandum decision and order on February 3, 2014, wherein it addressed each theory of relief and rejected all arguments advanced. Specifically, the court found that La Bella Vita again failed to provide any specific facts or concrete evidence regarding Shuler's alleged misappropriation of information, and that the "newly acquired evidence" provided was not new and had already been considered by the court in its previous decision.

Shuler and Eikova filed a motion seeking attorney fees and costs prior to the resolution of the reconsideration motion, and filed a supplemental memorandum of costs after receiving the court's written order on reconsideration. On April 8, 2014, the district court entered a memorandum and order awarding attorney fees and costs to Shuler and Eikova pursuant to Idaho Rule of Civil Procedure 54(e)(1) and Idaho Code section 12-120(3), finding that this action qualified as a commercial transaction.

La Bella Vita appeals the district court's decisions (1) striking its supplemental opposition brief in response to summary judgment and the affidavits offered in response to the motion to strike, (2) granting summary judgment in favor of Shuler and Eikova, and (3) awarding attorney fees to Shuler and Eikova. Shuler and Eikova argue the district court properly struck the additional filings, granted summary judgment, and awarded fees and costs. Shuler and Eikova seek attorney fees and costs on appeal.

---

[3] La Bella Vita failed to include in the appellate record its motion for reconsideration. For this reason, the following facts surrounding reconsideration are surmised from the register of actions, the district court's recitation of facts and arguments in its memorandum decision and order denying this motion, and the briefs submitted on appeal.

1.  Whether the district court abused its discretion in striking the supplemental brief offered in opposition to summary judgment and the affidavits submitted in response to the motion to strike.

2.  Whether the district court erred in granting summary judgment against La Bella Vita.

3.  Whether the district court erred in granting attorney fees and costs to Shuler and Eikova.

4.  Whether Shuler and Eikova are entitled to attorney fees and costs on appeal

## IV. STANDARD OF REVIEW

### A. Motion to Strike

"Summary judgment proceedings are decided on the basis of admissible evidence." *Campbell v. Kvamme*, 155 Idaho 692, 696, 316 P.3d 104, 108 (2013). "The admissibility of evidence contained in affidavits and depositions in support of or in opposition to a motion for summary judgment is a threshold matter to be addressed before applying the liberal construction and reasonable inferences rule to determine whether the evidence creates a genuine issue of material fact for trial." *Fragnella v. Petrovich*, 153 Idaho 266, 271, 281 P.3d 103, 108 (2012). "This Court applies an abuse of discretion standard when determining whether testimony offered in connection with a motion for summary judgment is admissible." *Gem State Ins. Co. v. Hutchison*, 145 Idaho 10, 15, 175 P.3d 172, 177 (2007). "A trial court does not abuse its discretion if it (1) correctly perceives the issue as discretionary, (2) acts within the bounds of discretion and applies the correct legal standards, and (3) reaches the decision through an exercise of reason." *O'Connor v. Harger Constr., Inc.*, 145 Idaho 904, 909, 188 P.3d 846, 851 (2008).

### B. Summary Judgment

"When reviewing a ruling on a summary judgment motion, this Court applies the same standard used by the district court." *Wesco Autobody Supply, Inc. v. Ernest*, 149 Idaho 881, 890, 243 P.3d 1069, 1078 (2010). "Under Rule 56(c) of the Idaho Rules of Civil Procedure, summary judgment is proper if 'the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Silicon Int'l Ore, LLC v. Monsanto Co.*, 155 Idaho 538, 544, 314 P.3d 593, 599 (2013) (quoting I.R.C.P. 56(c)). If a review of the evidence reveals no disputed issues of material fact, then summary judgment should be granted. *Smith v. Meridian Joint Sch. Dist. No. 2*, 128 Idaho 714, 718–19, 918 P.2d 583, 587–88 (1996).

"The burden of establishing the absence of a genuine issue of material fact is on the moving party," and this Court "will construe the record in the light most favorable to the party opposing the motion for summary judgment, drawing all reasonable inferences in that party's favor." *Wesco Autobody*, 149 Idaho at 890, 243 P.3d at 1078. Given these standards, summary judgment is improper "if reasonable persons could reach differing conclusions or draw conflicting inferences from the evidence presented." *McPheters v. Maile*, 138 Idaho 391, 394, 64 P.3d 317, 320 (2003). However, a "mere scintilla of evidence or only slight doubt as to the facts is not sufficient to create a genuine issue of material fact for the purposes of summary judgment." *Van v. Portneuf Med. Ctr.*, 147 Idaho 552, 556, 212 P.3d 982, 986 (2009).

## C. Record on Appeal

> The party appealing a decision of the district court bears the burden of ensuring that this Court is provided a sufficient record for review of the district court's decision. When a record or exhibit not included in the record on appeal is unavailable to the party who wishes to make it part of the record for appeal, it is incumbent on that party to move the district court, or petition this Court, to order augmentation of the record on appeal with the relevant record(s) or exhibit(s). When a party appealing an issue presents an incomplete record, this Court will presume that the absent portion supports the findings of the district court. We will not presume error from a silent record or from the lack of a record.

*Gibson v. Ada Cnty.*, 138 Idaho 787, 790, 69 P.3d 1048, 1051 (2003) (citations and quotations omitted).

## V. ANALYSIS

### A. The district court did not err in striking the supplemental brief offered in opposition to summary judgment and the affidavits offered in response to the motion to strike.

At the conclusion of the hearing on Shuler and Eikova's motion for summary judgment, La Bella Vita moved the court for permission to supplement the summary judgment record with certain outstanding discovery items. Shuler and Eikova did not oppose the request, so long as additional argument was not permitted. La Bella Vita agreed to this condition on the record and the court ruled from the bench. Specifically, the court allowed for the submission of the outstanding discovery materials, but cautioned the parties that additional argument would not be considered. The district court received the additional information, which included an affidavit from La Bella Vita's attorney, Shuler's discovery responses establishing the precise dates Eikova began making and inputting client appointments prior to its February 22, 2011 opening, as well as Eikova's business formation papers. However, in addition to the agreed-upon discovery

7

responses, La Bella Vita also filed a "Supplemental Brief in Opposition to Motion for Summary Judgment." In response to this supplemental opposition, Shuler and Eikova moved to strike the brief, arguing it violated the procedural rules governing summary judgment, the parties' agreement, and the court's ruling memorializing the parties' agreement.

La Bella Vita opposed the motion to strike, supported by new affidavits from Davidson and one of its customers, Shannon McCarrel (McCarrel). La Bella Vita argued that supplemental briefing was necessary because the outstanding discovery responses revealed new information material to the summary judgment analysis. After reviewing the motion to strike and the response, the district court struck the supplemental brief and the additional affidavits filed in opposition to the motion to strike. The district court reached its decision on dual grounds. For one, and citing Idaho Rule of Civil Procedure 56, the district court found that "there is no rule of civil procedure allowing a party opposing a motion for summary judgment to file a second, supplemental brief in opposition." Specifically, it found that Rule 56(c) "does not provide for a party opposing summary judgment to file a second opposition brief." Instead, the district court found that the Rule provides the adverse party "one opportunity to submit opposing affidavits and/or an answering brief," documents which must be filed "'at least 14 days prior to the date of the hearing.'" Second, and alternatively, the district court found that La Bella Vita's filing of a supplemental brief was in violation of the court's order and the parties' agreement that supplementation would be permitted so long as no additional argument was submitted. Because La Bella Vita violated this order, the district court found good cause to strike the supplemental brief and additional affidavits.

On appeal, La Bella Vita contends that the district court erred in striking its supplemental opposition brief and the affidavits offered in response to the motion to strike. Specifically, La Bella Vita argues that the court erred in finding that the filing of a supplemental brief is not permitted under the civil rules. Whereas the district court found nothing in Rule 56 permits the filing of a supplemental opposition brief, La Bella Vita asserts that "there is nothing in the Rules of [Civil] Procedure that [prohibits] the supplementation." This Court need not reach this issue, however, because the district court based its ruling on two grounds and La Bella Vita has failed on appeal to challenge an alternative and independent ground for the court's decision. Specifically, the district court granted the motion to strike on two alternative grounds: procedure, and second, violation of the court's order memorializing the parties' agreement.

8

In the context of summary judgment, the Court has repeatedly held that "an appellant's failure to address an independent ground for a grant of summary judgment is fatal to the appeal." *Weisel v. Beaver Springs Owners Ass'n, Inc.*, 152 Idaho 519, 525–26, 272 P.3d 491, 497–98 (2012). "[T]he fact that one of the grounds may be in error is of no consequence and may be disregarded if the judgment can be sustained upon one of the other grounds." *Andersen v. Prof'l Escrow Servs., Inc.*, 141 Idaho 743, 746, 118 P.3d 75, 78 (2005) (citation and quotations omitted). These same principles apply here. La Bella Vita failed to contest the alternative ground relied upon by the district court in striking the supplemental brief and affidavits, specifically the parties' agreement and La Bella Vita's violation of the court's order memorializing this agreement. This provides an adequate and independent basis for the decision to strike. By failing to raise and challenge this ground on appeal, La Bella Vita has waived this issue and conceded a valid basis for the court's decision. As such, the court's grant of the motion to strike stands.

## B.     The district court erred in finding no disputed issues of material fact in granting summary judgment in favor of Shuler and Eikova.

When reviewing a summary judgment ruling on appeal, this Court's review is limited to the pleadings, depositions, and admissions on file, together with any affidavits, to determine whether there exists any genuine or disputed issue as to any material fact.[4] I.R.C.P. 56(c). Based upon a thorough review of these items, and for the reasons outlined in greater detail below, this Court holds that the affidavit and deposition testimony, when viewed in a light most favorable to La Bella Vita, supports the vacation of the summary judgment for Shuler and Eikova.

In the complaint, La Bella Vita alleges that Shuler violated the confidentiality agreement and ITSA by taking and using proprietary and confidential client information. On summary judgment, the district court found that La Bella Vita failed to demonstrate that the information at issue was confidential or constituted a trade secret. Notwithstanding this finding, the district court further determined that La Bella Vita failed to submit any evidence to show that Shuler

---

[4] Because appellant La Bella Vita failed to include in the appellate record the moving and opposing papers surrounding summary judgment, and because neither party disputes the district court's characterization of the arguments in its memorandum decision and order granting summary judgment, this Court's analysis is based upon the district court's recital of the arguments below. Furthermore, at the outset of the summary judgment hearing, La Bella Vita stipulated to the dismissal of all defendants except Shuler and Eikova and all claims except for the breach of confidentiality agreement and violation of ITSA. La Bella Vita does not appeal the dismissal of these parties or claims. Lastly, because it is held in section V(A), *supra*, that the district court did not err in striking the supplemental brief in opposition to summary judgment as well as the additional affidavits filed by La Bella Vita in response to the motion to strike, this Court's review is limited to the original moving and opposing summary judgment papers, memoranda, affidavits, and deposition transcripts attached as exhibits to the same. The Davidson affidavit dated October 22, 2013 and the McCarrel affidavit dated October 25, 2013 will not be considered.

actually took and used any of the allegedly confidential information for Eikova's benefit. As framed by the district court in granting summary judgment, its analysis of the ITSA claim also disposed of the breach of confidentiality claim. The district court reasoned that "when there is no evidence of any misappropriation of trade secrets, there can be no breach of a confidentiality agreement." Thus, the court's findings and conclusions on summary judgment as to both claims were based almost entirely on its determination of the ITSA claim.

To prevail in a claim brought under the ITSA, "[a] plaintiff must show that a trade secret actually existed." *Basic American, Inc. v. Shatila*, 133 Idaho 726, 734, 992 P.2d 175, 183 (1999); Idaho Code § 48-801. Pursuant to the ITSA:

> "Trade secret" means information, including a formula, pattern, compilation, program, computer program, device, method, technique, or process, that:
>
>> (a) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and
>>
>> (b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Idaho Code § 48-801(5). To help determine whether information qualifies as a trade secret, the *Basic American* Court relied on the Restatement and looked at the following six factors:

> (1) the extent to which the information is known outside [the plaintiff's] business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by him to guard the secrecy of the information; (4) the value of the information to him and his competitors; (5) the amount of effort or money expended by him in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Basic American*, 133 Idaho at 735, 992 P.2d at 184 (quoting Restatement of Torts § 757 cmt. b (1939)) (alteration in original). "All of these factors address the issue of whether the information in question is generally known or readily ascertainable." *Wesco Autobody Supply, Inc. v. Ernest*, 149 Idaho 881, 898, 243 P.3d 1069, 1086 (2010).

There are genuine factual disputes regarding the nature of the information at issue in this case, specifically whether it qualifies as confidential and trade secret. Furthermore, there is a dispute as to whether this information was misappropriated, or taken and used, for Eikova's benefit. In moving for and opposing summary judgment, the parties supported their positions

10

primarily with affidavit testimony from numerous employees and customers. Although there are numerous affiants, the testimony was substantially similar with certain important distinctions.

For example, in opposing summary judgment, La Bella Vita relies on affidavit testimony from many of its clients describing how they were notified by representatives of Eikova about its opening. These clients all assert that they keep their contact information confidential, but attest that La Bella Vita had this information. Because they consider their information to be non-public, they each were surprised when they were contacted by Eikova representatives without solicitation. Although lacking any direct evidence of misappropriation, these affiants each imply that Eikova could have only obtained this information from the records kept at La Bella Vita.

In support of summary judgment, Shuler and Eikova rely on affidavit testimony from a number of La Bella Vita's former employees—parties who transitioned to employment with Eikova. These employees all unambiguously assert that they never took or misappropriated, in any form, La Bella Vita's client lists, scheduling lists, client calendars, client information, or any other information of any type for any advertising or client outreach in the creation, promotion, or opening of Eikova. Instead, each affiant describes a more organic process for the development of Eikova's client list. Specifically, Shuler and her new employees generated their own advertising lists from people they already knew, both socially and professionally. These lists were allegedly created from a variety of other sources, including: cell phone and email contacts, church membership directories, social media connections, suggestions and referrals from family and friends, public phone books, online directories, internet searches, word of mouth, and use of referral cards. Eikova employees also participated in local fundraisers and craft shows as a way of introducing Eikova to the community.

Furthermore, Shuler specifically testified in her affidavit:

> … I had many clients and customers who specifically sought me out when they learned that I was no longer employed by [La Bella Vita]. Many of my clients and customers did not receive any advertising directly from me, my employees[,] or [Eikova][,] but came to me at my new salon anyway when they learned that I had opened my own salon.

Based upon a thorough review of the record, there are three genuine disputes of material fact which render this case inappropriate for summary adjudication. First, there is a dispute surrounding the "baby shower list," specifically whether Davidson authorized the use and release of La Bella Vita's official client list in generating or supplementing the invitation list for the

11

baby shower being thrown in Shuler's honor. Second, there is a dispute about La Bella Vita's business practices and whether these practices compromised the confidentiality of its official client list and other client-related information. Third, there is a dispute regarding whether Shuler actually took and used any confidential information in the creation and promotion of Eikova.

### 1. Baby Shower List

The factual dispute regarding the baby shower list is most clearly demonstrated through a comparison of Davidson's testimony and the testimony of Shuler and Amy Comstock-Combs (Combs). The dispute revolves around the creation and use of the baby shower list utilized to send out invitations for Shuler's shower. At the center of the baby shower is Combs, a mutual client and friend of both Davidson and Shuler. Combs met Davidson at a craft show when Davidson was new to Pocatello and before she started La Bella Vita. Combs was one of Davidson's original clients when La Bella Vita opened. However, on a date Davidson had overbooked herself, Davidson referred Combs to Shuler. Satisfied with Shuler's work, Combs elected for Shuler to be her regular stylist. While Shuler was still employed at La Bella Vita, she became pregnant and a baby shower was held in her honor. These facts are all not in dispute.

It is further undisputed that La Bella Vita's official client list was used to create or supplement a mailing list for Shuler's baby shower invitations. There is a genuine dispute, however, as to whether Davidson authorized the use of La Bella Vita's client list for this purpose.

Combs testified regarding the inception and creation of the baby shower list as follows:

> When I found out [Shuler] was pregnant I thought it would be fun to have a baby shower for her. I discussed this with [Davidson]. We talked about if we should have it at the salon or at someplace else. We decided to have it at the [s]crapbook store [where] I was working at [the time] because the salon would still be open at the time we were having the shower and that might not be the best thing for customers still having services. Also parking would be an issue.
>
> I was in charge of the invitations for the baby shower for [Shuler] and I enlisted the help of my sister Tam[my] Comstock who also had worked at the salon. [Davidson] said she would get me a Client/Customer list of names and information so I could send out invitations for the shower. I distinctly remember [Davidson] instructing the receptionist to get me a Client/Customer list of names and information for the invitations. I used the Client/Customer list of names and information that was given to me at [Davidson's] direction to create the invitations for the baby shower that [Davidson] and I held for Mandi Shuler together.

[Davidson] never asked me to return or to give back the Client/Customer list of names and information that was given to me. Further, [Davidson] never asked me to keep the Client/Customer list of names and information confidential in any way. She simply directed that it be given to me.

Corroborating Combs' testimony, Shuler asserted in her affidavit as follows:

While I was employed by [La Bella Vita] and prior to a baby shower that was being given for me, [La Bella Vita] Owner, Candy Barnard-Davidson[,] directed me to clean up the Client/Customer list. She told me that the Client/Customer list was being given to Amy Comstock-Combs[,] a non-employee friend[,] so that invitations could be sent out for the baby shower. Candy Barnard-Davidson later admitted to me that she gave the Client/Customer list to Amy Comstock-Combs and that the invitations in fact were sent out from the information contained in [La Bella Vita's] Client/Customer list.

Shuler reiterated in her deposition, "[Davidson] gave permission for two of my clients [Combs and Comstock] to take my client list and put on a baby shower for me."

Further, Shuler testified about cleaning up La Bella Vita's client list so that the same could be used for baby shower invitations. In pertinent part, Shuler stated:

Jodi Espindola and I printed a client list for me. So you can --- in the computer system [at La Bella Vita], you can [for example] go in and specify clients of Mand[i] Shuler and print off a list according to dates. And [Davidson] didn't want invitations sent to men or multiple invitations being sent to [the same household], so I just went through and combined --- if there was a mother with two daughters, I would put parentheses around them and write "daughters" next to two daughters --- like daughter and whoever the mother was.
And then after I was done with that, [Davidson] was in town, and she looked over the list. We thought the amount of invitations looked correct, and [Combs] came and picked the baby shower list up from [Davidson].

It was Shuler's understanding that Combs then "gave the list to Tammy [Comstock], [who] is [Combs'] sister, and Tammy typed the list up in label format[,] … printed [those] labels[,] and sent out mailers."

The testimony of Combs and Shuler regarding the baby shower list, however, is directly contradicted by Davidson's affidavit testimony. In opposition to summary judgment, Davidson testified that "[Shuler] was never directed by me to 'clean up' the La Bella Vita customer list and give it to [Combs] for the purpose of sending out invitations for the baby shower." Further, Davidson unequivocally declared, "I never stated or admitted to anyone that the client list was given to [Combs] for the purpose of sending out baby shower invitations," and that "use of [the client] list for that purpose was not authorized." Thus, Davidson flatly denies authorizing use of

13

La Bella Vita's client list for the purpose of developing the invitation list for Shuler's baby shower.

The conflicting testimony regarding the genesis of the baby shower list creates a genuine factual dispute which simply cannot be construed against La Bella Vita on summary judgment.

### 2. La Bella Vita's Client List and Client-Related Information

As to La Bella Vita's official client list and related information, there is also a factual dispute as to whether this information qualifies as confidential and trade secret, specifically regarding whether La Bella Vita took the steps necessary to protect this information. Davidson addressed La Bella Vita's confidentiality and privacy practices, testifying in pertinent part:

> [La Bella Vita's] data system included the names, phone numbers, physical addresses, email addresses, special dates (birthday, anniversaries), services and product profiles used by the client, color formulas, personal intake forms for spa services, and referral information. This information was generated for the specific purpose of keeping the clients as customers and maintaining good client relations. I was careful to ensure that all of this information was included as part of our confidentiality contract with our employees. The importance of keeping this information confidential was discussed in the confidentiality contract as well as the employee handbook.
>
> … All [employees] were trained to know that the customers of La Bella Vita were customers and clients of La Bella Vita and not [customers of] the employees.
>
> I hired Amanda Shuler as the Salon Manager in February of 2006. Initially she shared the Salon Manager responsibilities with Christina Entzel. Ultimately [Shuler] became the overall Salon Manager in April 2010. Her responsibilities included overseeing the entire operation of the business, including: a) hiring employees; b) training employees; c) assuring the employees were familiar with the Employee Handbook and the Confidentiality Agreement which they needed to sign in order to work at the salon; d) protection of our intellectual property including the types of services that we provided and the client contact information.
>
> Amanda Shuler had been trained and was instructed to carefully guard the information which we had concerning our clients and I specifically reviewed with her the procedures that were to be followed in the spa when I was not there to [e]nsure that the employees did not disclose this confidential information to anyone.
>
> The client information was made available to employees in order to allow them to use it for salon/spa business and promotions, as for example sending "Thank You" cards or notifying them of promotions that the spa was offering. We also would use the client list to update [our] current client information. This was all done inside the La Bella Vita premises and was supposed to be done in a way

14

that the information did not become public. Most of our clients are women and, in my experience, they do not like to have their personal information shared with anyone else. They want their information that is given to La Bella Vita kept at that location and not to be used for any other purpose.

…

With respect to the allegations that I compromised my client list, scheduling list, client calendars, client information and any other information that was declared confidential under the Confidentiality Agreement, I state unequivocally that at no time did I ever authorize any of these documents to be released to anybody.

…

Employees were given daily scheduling lists but these lists were never shown or placed in a location where a client or third party could see them. Employees of La Bella Vita were specifically instructed not to disclose this information or to make it visible to the eyes of customers or third parties inside the premises at any time. It was the specific responsibility of Amanda Shuler to ensure that the calendars, scheduling lists and client lists were not readily available to anyone other than employees of La Bella Vita. At the end of each day the employees of La Bella Vita were required to return their daily calendars with the information contained thereon, and any information that the employees had added, to the front desk. These lists were supposed to be shredded by the employees at the front desk. Amanda Shuler was responsible for making sure this got done. This was done to [e]nsure that the information was not left lying around. It was also the responsibility of the front desk employees to obtain additional updated information regarding the client to be added to the computer system.

Furthermore, current La Bella Vita employee Christina Entzel stated, "During my time working at La Bella Vita, [Davidson] [has] had a very strict business practice [of keeping] client lists confidential. . . . [She] was extremely careful with respect to confidentiality of the lists and did not allow anyone to use it for any purpose outside La Bella Vita."

Providing a contrary view, and in support of summary judgment, Shuler and other former La Bella Vita employees testified that this client-related information was loosely protected and often left out in public spaces in the salon, allowing patrons and other visitors easy access to it. Specifically, Shuler and the individually named defendants submitted identical affidavit testimony regarding the handling of client information and the institutional steps taken by La Bella Vita to safeguard the confidentiality of this information. The affiants testified as follows:

Additionally, while I was employed by [La Bella Vita], I personally observed that it was the common practice for [La Bella Vita] employees to print copies of [La Bella Vita's] Client/Customer list, client information and scheduling lists out on the front desk, or in their work areas to write thank you cards and for

15

other reasons. I also personally observed that people who were not employed by [La Bella Vita], including customers, friends and/or family of the employees, were in these locations throughout the day. Anyone in these areas, including non-employees[,] could pick up, look at, review or even take a copy of [the] Client/Customer list at any time. [La Bella Vita's] owner saw this happening and never took any action to correct it.

Further, it was also the practice of [La Bella Vita] to have its employees prepare a written schedule for each day and to have the written schedule taped up or sitting out at their work station area. Any person receiving services during that day, or any family or friends who happened to be in the salon could see the names and information of all of the customers who were scheduled for services. [La Bella Vita's] owner saw this happening and never took any action to correct it.

Thus, there is directly conflicting testimony regarding La Bella Vita's practices with respect to its treatment and protection of client information. This creates a disputed issue as to one of six factors discussed in *Basic American*, specifically the third factor which considers "the extent of measures taken … to guard the secrecy of the information."

However, even with Shuler's affidavit testimony purporting to undermine La Bella Vita's privacy practices, Shuler admits during her deposition that she understood this client material was intended to be confidential and proprietary to La Bella Vita. The following exchange during Shuler's deposition is instructive in this regard:

Q: All right. Is there anything in the confidentiality agreement that you disagree with in hindsight?

A (Shuler): No.

Q: I mean, you agree[d] to be bound by its terms?

A: Correct.

Q: What did you understand you were signing when you signed the confidentiality agreement?

A: That I would not take a client list from [La Bella Vita] and use it or give it away or sell it or anything that way.

Q: Is it your contention that the confidentiality agreement was limited to a client list?

A: People that I could have access to only by La Bella Vita, yes.

Q: I'm not sure I understand your answer.

A: We couldn't take [Davidson's] confidential information that was in her computer, client list, a printed list or a written list of formulas, addresses, phone numbers, any of her information, any notes from message therapists, anything like that.

16

Shuler further articulated her understanding that the confidentiality agreement came into existence as a condition of employment at La Bella Vita in response to a former employee who took the client list when she was terminated. While Davidson denies any knowledge of any prior theft of La Bella Vita's client list by a disgruntled former employee, Davidson agrees the information is meant to be proprietary and confidential to La Bella Vita and that the purpose of the confidentiality agreement is to protect client-related information from outside use and dissemination.

Furthermore, the deposition testimony of Dalley lends support for the proposition that La Bella Vita employees understood that their primary obligation under the confidentiality agreement was to keep the personal and service-related information of clients confidential. It is worth noting that it was Shuler, as Dalley's supervisor, who discussed and explained the confidentiality agreement to Dalley at the time she signed the document.

The consistent testimony from Davidson, Shuler, and La Bella Vita's current and former employees regarding their understanding of the confidentiality agreement and its coverage of the salon's official client information, together with the conflicting testimony on La Bella Vita's business practices, creates a genuine factual dispute as to the confidential nature of La Bella Vita's client list and client-related information. This factual dispute cannot be construed against La Bella Vita on summary judgment.

### 3. Misappropriation

Setting aside whether the information at issue is confidential, there are genuine disputes regarding misappropriation. On summary judgment, the district court found insufficient evidence to establish Shuler actually took and used confidential information belonging to La Bella Vita. However, this finding was built upon the court's unsupported determination that the baby shower list did not contain any confidential information. In section V(B)(1), *supra*, this Court holds that there are in fact disputed issues as to the confidential nature of the baby shower list. Furthermore, and although the trial court made no direct findings as to the nature of La Bella Vita's official client information, this Court further holds in section V(B)(2), *supra*, that there are disputed issues as to whether this information qualifies as confidential. For the reasons outlined below, this Court further holds that there is conflicting evidence on the issue of misappropriation.

As to La Bella Vita's client list and related information, Shuler and the other former La Bella Vita employees unequivocally deny taking any of La Bella Vita's official client-related

17

information, but also aver that the La Bella Vita client list was compromised by sloppy business practices. Despite these assertions, Shuler and these former employees do not dispute that, under the terms of the confidentiality agreement, this client-related information was intended to be confidential and proprietary to La Bella Vita. As to the baby shower list, it is undisputed that this list was derived, at least in part, directly from La Bella Vita's official client list. It is further undisputed that Shuler utilized the baby shower list in the creation or supplementation of Eikova's client list. What is disputed is whether this use of the baby shower list constitutes a misappropriation of a trade secret.

Shuler and others at her direction admit to using the baby shower list in the creation of Eikova's client list. These same individuals, however, deny taking or using any of La Bella Vita's official client information, specifically stating that the information they used did not come directly from La Bella Vita's computer system. This is a distinction without a difference, and the following exchanges during Shuler's deposition illustrate this point:

Q: Do you know what happened to the --- this [baby shower] list after the baby shower invitations were printed?

A (Shuler): After the baby shower, Tammy [Comstock] gave me the list in label format so I could send thank you cards to my clients.

Q: Okay. How about the [baby shower] list itself?

A: I don't know what happened to it.

Q: Did you make any effort to retrieve it?

A: No. It could have ended up at the salon and shredded. I'm not sure.

…

Q: So just to make sure I have this in the record, you are telling me that you did not use any client list or any derivation of a client list for the purpose of contacting any of your clients that went with you to Eikova?

A: I still had the baby shower list Tammy Comstock had given me.

Q: Do you have that [baby shower] list today?

A: No, I don't.

Q: What happened to it?

A: I threw it away.

Q: Do you remember when you threw it away?

18

A: Yeah. I had a notebook that I transferred most of the information to that I could --- I kind of put as many of my clients in alphabetical order that I could think of at home, and as soon as I transferred the people on that list I still serviced, which I didn't service all of them anymore, I threw it away.

Q: When did you decide that you were entitled to use the baby shower list as a basis for contacting people to let them know you were moving to Eikova?

A: I don't think I felt like I was entitled to it. It was given to me.

Q: But didn't you still consider that to be confidential information up until the time you left?

A: No. It was given to me from an outside party. My clients' names --- many of them weren't even spelled on it correctly.

Q: The fact that it had been prepared for your daughter's --- your daughter's baby shower, you didn't --- you decided at that point in time it was no longer confidential?

A: Tammy [Comstock] could have given that list to anyone.

Dalley corroborates Shuler's testimony that the baby shower list was used to generate or supplement Eikova's client list. A pertinent portion of Dalley's deposition transcript reads as follows:

Q: I would like to have you tell me what information you have regarding that --- that [baby shower] list. I mean, what can you tell me about it?

A (Dalley): I was not employed at La Bella Vita at the time that list was given or printed. I have seen the list after we had opened Eikova. That's --- we used that information --- a lot of it were [Shuler's] friends, family, people that she already knew, because it was her baby shower. There wouldn't be people that she wasn't familiar with.

Q: I see. So the information you have about the baby shower list is information that other people told you?

A: I've seen the list of the baby shower.

Q: You've seen the list. Oh, all right. Do you know where that list is today?

A: I don't.

Q: Where was the last place you saw it?

A: When [Shuler] compiled the information from it and gave it to us to use to contact people at Eikova once it had opened.

19

Q:      Okay. What information was on the list?

A:      Names and addresses of [Shuler's] friends and family.

Q:      How many people were on the list?

A:      I'm not sure.

Q:      How many pages was the list?

A:      I believe it was two or three pages.

Q:      Did you get the list from Amanda Shuler?

A:      I never had my own copy of the list.

Q:      Oh. What did you have?

A:      We had one --- like, at the salon, so it was never mine. It was at Eikova. It was just there, and it was at the very beginning.

…

Q:      So you had possession of a list when you were at the front desk?

A:      Sure. Yes.

Q:      And you used that list and entered it in the computer ---

A:      Yes.

Q:      --- and contacted the people that were on the list?

A:      Yes.

Q:      And you were told by Amanda Shuler that the list was from her baby shower?

A:      Information from the --- yes.

Q:      Okay. I'm just trying to figure out what she told you so that you knew what the list was.

A:      It had all of that information on it, baby shower --- baby shower names and then [the stuff that] she had added to it from her own information. Does that make sense?

Q:      Yes.

A:      Okay.

Q:      So there were names on there that were from a baby shower list, as well as additional names that Amanda Shuler had placed on the list?

A:      Yes.

Q:      But that was a list that Amanda Shuler gave you?

20

A:        That was at the salon, yes.

Thus, the testimony of Shuler and Dalley demonstrates that the baby shower list was at least partially derived from La Bella Vita's official client list and also used as a primary source in the creation of Eikova's client list. This goes to the heart of misappropriation.

Lastly, the affidavit testimony of La Bella Vita clients offered in opposition to summary judgment provides circumstantial evidence of misappropriation. The affidavit testimony of these clients is substantially similar in most respects, with each affiant stating that their contact information is private and non-public and implying that Eikova could have only obtained this information from La Bella Vita's official records. The district court dismissed these accusations as too tenuous and speculative to survive summary judgment because there was not any direct evidence of misappropriation. The district court's characterization of this testimony as conjecture is not entirely misplaced. A person's contact information can be ascertained in a variety of ways, including through the involuntary sharing or selling of information. It is nearly impossible to completely control these other avenues and there are a variety of methods Eikova could have utilized to obtain this information, even though these clients considered the same to be non-public and confidential.

However, Margaret Beatty's (Beatty) testimony deviates in one significant way from the testimony of the other clients: specificity. Beatty had an appointment at La Bella Vita in February 2011, the same month Eikova opened. Shortly after Eikova's opening, Beatty testified, "I was contacted by someone from Eikova at the front desk to tell me that my appointment with [Harrington] had been moved from La Bella Vita to Eikova. This was done without my knowledge or consent." This testimony creates a disputed issue as to misappropriation, as it provides a sufficiently definite nexus between La Bella Vita's internal appointment calendar and Eikova's. This testimony supports the assertion that Eikova took and used La Bella Vita's confidential client contact and scheduling information.

For all of these reasons, there are genuine disputes on the issue of misappropriation, disputes which cannot be construed against La Bella Vita on summary judgment.

**4.  District Court's Memorandum Decision and Order on Summary Judgment**

The district court made many key findings on summary judgment, findings which are undercut by the genuine factual disputes discussed above. In granting summary judgment against La Bella Vita, the district court determined that La Bella Vita failed to "come forward with

sufficient evidence to raise a question of fact regarding a violation of a trade secret." First, the district court found that La Bella Vita failed to keep the information contained in the baby shower list confidential given that non-employees Combs and Comstock received certain client information in the planning of Shuler's baby shower and that the baby shower list is still unreturned. Considering Davidson's testimony unequivocally denouncing this use of La Bella Vita's information, this finding does not rest on solid ground. Notwithstanding Davidson's testimony, the trial court reasoned that because this information was released and remains unconfined, it is no longer confidential. This rationale presents only half of the story.

It is undisputed that everyone at La Bella Vita understood or considered this client-related information to be confidential, at least at the inception of their respective terms of employment. There are disputes as to whether sloppy business practices compromised this intent, and also whether the official client list was properly accessed in the creation of the baby shower list. The district court found that despite these disputed facts, because this baby shower list was created, distributed, and remains at large, these acts suggest this information is not and was never confidential. The outcome of this lawsuit will likely rest in large part on whether this baby shower list was properly created and released in the first place. The district court's rationale fails to account for the discrepancies over whether the client-related information was intended or understood as confidential and the steps taken to prevent a leak of the same.

Second, the district court found that under the ITSA, information qualifies as confidential only if it cannot be derived from other means. The court cited Shuler's testimony that she and her Eikova employees generated their own lists from a variety of sources, including word or mouth from friends, family, and acquaintances, social media contacts, church directories, and internet databases and searches. This analysis, however, fails to account for, or even acknowledge, Shuler's heavy reliance on the baby shower list as a source of inspiration in the creation of Eikova's list. Given this reliance on the baby shower list, it is unclear from the record whether Shuler and the other Eikova employees would have been capable of deriving or recreating the same information utilizing these others means. While the district court dismissed as speculative the client testimony that the only way Eikova could have obtained their information was by taking all or some of La Bella Vita's client list, the trial court failed to acknowledge the use of the baby shower list, a list which is an undisputed derivative of the client list.

Lastly, and "notwithstanding the finding that the information contained on the baby shower list was not confidential," the district court also found that La Bella Vita failed to meet its burden of establishing whether Shuler "actually used any of the information contained in the baby shower list" or whether Shuler "wrongfully took or used any other 'confidential' information." This finding, however, is contradicted by Shuler's affidavit testimony wherein she expressly admits to using information contained in the baby shower list in the creation of Eikova's new client list. Shuler testified, "I had a notebook [where] I transferred most of the information … [from the baby shower list]." More specifically, she stated that she created an Eikova list in her notebook by "put[ting] as many of [her] clients in alphabetical order that [she] could think of [while brainstorming] at home," and that she supplemented this notebook list with most of the information from the baby shower list. Shuler concluded, "[A]s soon as I transferred the people on [the baby shower] list I still serviced, [since] I didn't service all of them anymore, I threw it away."

Regarding La Bella Vita's claim that Shuler breached the confidentiality agreement, the court failed to squarely address this issue, reasoning that without a violation of the ITSA, there could not be a breach of the agreement. Because this Court holds that there are genuine factual issues as to the existence of a trade secret and a misappropriation of the same, there remains an issue as to whether the confidentiality agreement was breached by Shuler and Eikova.

## 5. Summary of Disputed Issues Precluding Summary Judgment

When viewed in a light most favorable to La Bella Vita, there are numerous disputed factual issues regarding whether the information at issue in this case qualifies as confidential and trade secret. These disputed issues render this case inappropriate for summary judgment against La Bella Vita. As to La Bella Vita's client list and client-related information, the affidavit and deposition testimony of Davidson and current and former La Bella Vita employees conflicts as to the salon's practices regarding the safeguarding of this information. There is no dispute, however, that La Bella Vita employees understood the same information as being confidential and proprietary to La Bella Vita, signing a confidentiality agreement to that end.[5] As to the baby shower list, there is a genuine dispute as to whether Davidson authorized the accessing and use

---

[5] All employees except Coffin signed the Confidentiality Agreement. This raises an additional question regarding whether La Bella Vita's client-related information was properly protected, given that Coffin had access to this information but was not constrained by the agreement.

23

of La Bella Vita's official client list to assist in the creation of the shower list. Davidson emphatically denies granting such permission, while Shuler and Combs testify to the contrary.

As stated above, to prevail in a claim brought under the ITSA, "[a] plaintiff must show that a trade secret actually existed." *Basic American, Inc. v. Shatila*, 133 Idaho 726, 734, 992 P.2d 175, 183 (1999); I.C. § 48-801. To determine whether information qualifies as a trade secret, this Court looks at six factors, "[a]ll of [which] address the issue of whether the information in question is generally known or readily ascertainable." *Wesco Autobody Supply, Inc. v. Ernest*, 149 Idaho 881, 898, 243 P.3d 1069, 1086 (2010). The emphatic denials by Shuler and the other named defendants that they did not take La Bella Vita's client list or any derivation of the same are rendered meaningless by admissions from the same that the baby shower list was utilized in the creation of Eikova's client list. It is undisputed that La Bella Vita's client-related information was intended and understood by its employees and management to be confidential and proprietary to La Bella Vita. While there is a dispute about whether this information is actually confidential and trade secret, or might have been initially but otherwise lost its confidential character over time, all parties expressed an understanding that the purpose underlying the confidentiality agreement signed by Shuler and the other La Bella Vita employees was to protect this information. Shuler and Eikova admit that the baby shower list was, at least in part, derived from this official information, and also used to generate Eikova's list. The aforementioned disputes over whether Davidson authorized use of this official information in the creation of the baby shower list and whether La Bella Vita's business practices somehow compromised the confidentiality of its client information preclude resolution of this action on summary judgment. The law is settled that these sorts of factual disputes defeat a motion for summary judgment. *Petricevich v. Salmon River Canal Co.*, 92 Idaho 865, 868–69, 452 P.2d 362, 365–66 (1969).

Further, there are disputes regarding misappropriation. Shuler admitted to taking and using the baby shower list in the creation of Eikova's client list. The baby shower list is a derivation of La Bella Vita's formal client list, and the affidavit testimony, viewed in a light most favorable to La Bella Vita, establishes that official information was accessed in the creation of the shower list. Beyond the baby shower list, however, there is no concrete evidence of Shuler taking client information directly from La Bella Vita's system. While the testimony of La Bella Vita clients is mostly circumstantial, Beatty's testimony regarding the unsolicited phone call she

24

received from Eikova regarding her "new" appointment at Eikova provides some evidence that Eikova improperly accessed La Bella Vita's official appointment calendar.

Lastly, it is worth noting that the district court never squarely reached the issue of whether La Bella Vita's client list and other client-related information is confidential—both at the inception of defendants' terms of employment and also whether it maintained its intended confidential character over time. Instead, the court focused solely on the character and nature of the baby shower list. However, an analysis of the baby shower list cannot be conducted in a vacuum. A proper analysis of the baby shower list, by necessity, implicates the character and nature of the official client information from which it was derived.

## C.      The award of attorney fees and costs to Shuler and Eikova is vacated.

Idaho Code section 12–120(3) allows for the recovery of attorney fees by the prevailing party in a civil action to recover on any commercial transaction. After the grant of summary judgment in favor of Shuler and Eikova, the district court entered a memorandum and order awarding attorney fees and costs to Shuler and Eikova pursuant to Idaho Rule of Civil Procedure 54 and Idaho Code section 12-120(3), finding this action qualifies as a commercial transaction. Given the reversal of the district court's decision, Shuler and Eikova are no longer the prevailing parties in this case. Thus, the award of attorney fees is vacated.

## D.      Shuler and Eikova are not entitled to attorney fees on appeal.

Shuler and Eikova seek attorney fees on appeal pursuant to Idaho Code section 12-120(3). A prerequisite to an award of attorney fees under this section is that the party prevails. Shuler and Eikova are not the prevailing party in this appeal. Therefore, they do not qualify for an award of attorney fees. La Bella Vita does not seek fees on appeal.

## VI. CONCLUSION

The district court's grant of summary judgment in favor of Shuler and Eikova is reversed, and this case is remanded for further consideration consistent with this decision. The award of fees and costs in favor of Shuler and Eikova is also vacated. Costs on appeal are awarded to La Bella Vita.

Chief Justice BURDICK, Justices EISMANN, J. JONES and HORTON CONCUR.