# IN THE SUPREME COURT OF THE STATE OF IDAHO
## Docket No. 45404

| | | |
|---|---|---|
| BRENT H. GREENWALD dba, GREENWALD NEUROSURGICAL, P.C., an Idaho Corporation, | ) ) ) ) | Boise, December 2018 Term |
| Plaintiff-Respondent-Cross Appellant, | ) ) ) | Filed: March 15, 2019 |
| v. | ) ) ) | Karel A. Lehrman, Clerk |
| WESTERN SURETY COMPANY, | ) ) | |
| Defendant-Appellant-Cross Respondent. | ) ) | |

Appeal from the District Court of the Seventh Judicial District, State of Idaho, Bonneville County. Joel E. Tingey, District Judge.

The judgment of the district court is <u>vacated</u> and the case is <u>remanded</u> for further proceedings consistent with this opinion.

Elam & Burke, P.A., Boise, for appellant. Joshua S. Evett argued.

Swafford Law, P.C., Idaho Falls, for respondent. Larren K. Covert argued.

_____

STEGNER, Justice.

This appeal arises out of a Dishonesty Bond (the bond) issued by Western Surety Company (Western) that insured Greenwald Neurosurgical, P.C. (the P.C.), for up to $100,000 in losses caused by any fraudulent or dishonest act of any employee of the insured.

At the summary judgment stage, the district court found that an employee of the P.C. caused over $100,000 in losses to the P.C., while he was acting in the ordinary course of the P.C.'s business. The district court then issued a judgment to the P.C. for the policy amount of $100,000. Western appeals the district court's determinations that the employee caused the loss while acting in the ordinary course of business and that the P.C. actually suffered the loss. The P.C. cross-appeals from the district court's findings that it was the only entity insured under the bond and argues it was awarded too little by way of attorney's fees. For the reasons set out, we reverse the order granting summary judgment, vacate the judgment, and remand the case for further proceedings.

1

# I. FACTUAL AND PROCEDURAL BACKGROUND

Brent H. Greenwald, M.D. (Greenwald), is a neurosurgeon practicing in Idaho Falls, Idaho. Greenwald practices medicine under a professional corporation named Greenwald Neurosurgical, P.C. The P.C. was created in 2001. According to Greenwald, his medical office functioned as headquarters not only for the P.C., but also for his personal financial dealings and investments, as well as his real estate business.

The original bond application indicates that on November 5, 2002, Greenwald applied for a $100,000 Dishonesty Bond to insure "Greenwald Neurosurgical" from losses caused by its employees. On November 11, 2002, Western issued a $100,000 Dishonesty Bond insuring "Brent H. Greenwald dba Greenwald Neurosurgical" against the criminal acts of any employee as defined by the bond.

On December 8, 2009, the P.C. hired Matthew Udy (Udy) as a business and financial manager. According to Greenwald, Udy's responsibilities included receiving income from all sources, making payments on accounts payable, payments to credit card accounts, payments for other miscellaneous charges and services, and managing information technology issues at the medical office. Greenwald referred to Udy as his personal assistant and as a "financial manager of [the] medical practice." However, as evidenced by a 2012 W-2, the P.C. is the sole entity that employed Udy and paid for his services. (During the course of this litigation, Western conceded that the P.C. is an insured entity under the bond. However, it also maintained that only the P.C. was an insured because of language in the policy that limited coverage to fraudulent or dishonest acts of an employee of the insured.)

Also in 2009, Greenwald formed a real estate company, Allagash Realty, LLC (Allagash). According to Greenwald, Udy was responsible for managing Allagash, which included collecting Allagash's rents and other payments, as well as paying its creditors.

On September 11, 2013, Janeene Ditmore (Ditmore), the P.C.'s office manager, was notified that a questionable purchase had been made with one of Greenwald's credit cards. Udy was suspected of making the questionable purchase. Greenwald, along with Ditmore and Troy Clayton (Clayton), the CPA for the P.C., confronted Udy about the purchase. Udy confessed to wrongfully appropriating money and was fired that day. Due to the admitted wrongdoing, Clayton conducted an internal financial audit for the P.C. The audit consisted of an analysis of the P.C.'s financial records, Allagash's financial records, and Greenwald's personal credit card

accounts. Greenwald reported Udy's financial embezzlement to the police. Ultimately, on November 10, 2014, Udy pleaded guilty to felony Unauthorized Use of an Access Device (in violation of 18 U.S.C. § 1029) in federal court. He was subsequently sentenced on March 17, 2015. As a result of pleading guilty to Unauthorized Use of an Access Device, Udy was ordered to pay $275,488.32 in restitution.[1]

## A. Prelitigation communication between Western and the P.C.

By letter dated October 10, 2013, Larren Covert, the lawyer for Greenwald and Greenwald Neurosurgical, notified Western of their claim pursuant to the bond, that an employee had "stolen funds from the business."[2] As a result of this notification, Ginger Barnes (Barnes), Western's claim manager, alerted the firm representing Greenwald and the P.C. by letter dated October 17, 2013, that a sworn proof of loss form, along with other documentation, needed to be submitted to Western in order for her to process the claim.

Clayton responded to Western by letter dated January 19, 2014, with an attached sworn proof of loss form dated January 22, 2014. The proof of loss form identified the "approximate loss" in the amount of $347,395. Greenwald also submitted an affidavit dated January 15, 2014, with an attached, undated Summary Of Total Amounts Stolen (the prelitigation summary), in support of his claim. In his affidavit, Greenwald commented that Udy paid for the fraudulent credit card purchases "with stolen/embezzled funds from my checking accounts using a complex scheme of transfers between accounts."

Greenwald also broke down the estimated losses as follows: $32,000 in resulting legal fees and costs; $23,907.74 in "unauthorized charges, accounts, and expenses[;]" $161,396.52 embezzled from accounts; and $130,091.20 in "[f]raudulent use of business credit card accounts." Totaling these amounts equals $347,395.46, which is almost identical to the "approximate loss" identified in the proof of loss.

The undated prelitigation summary submitted to Western attempted to substantiate the amounts listed by Greenwald. Regarding the $161,396.52 embezzled from accounts, the prelitigation summary itemized that amount as follows: $140,095 stolen "from Allagash[;]" and

---

[1] The restitution order obligates Udy to pay $250,386.22 to Greenwald personally, and separate amounts payable to five credit card companies through which Udy made fraudulent charges: $7,522.30 (Citibank, opened by Udy without Greenwald's knowledge), $8,841.50 (Chase Marriott), $141.72 (CapitolOne Visa), $4,732.54 (Amex Personal), $3,864.04 (Zions, opened by Udy without Greenwald's knowledge). The restitution owed by Udy to the credit card companies equals $25,102.10.

[2] This notice was required by Section 13 of the bond.

3

$21,301.52 stolen from Idaho Spine & Brain. The latter amount (stolen from Idaho Spine & Brain) was further broken down into three separate checks from "ReHabAuthority." Those checks were made out to "Allagash," and each check's memo reads "Allagash c/o Idaho Spine & Brain 3155 Channing Way, Suite B Idaho Falls, ID 83404," which is also the address of the P.C.'s office. (The P.C.'s letterhead reads "The Spine & Brain Specialty Center;" however, the record does not explain the relationship between the Spine and Brain Specialty Center and the P.C.) The police report, submitted in support of the P.C.'s claim, indicated that the $140,095 "from Allagash" was an estimated amount of Allagash rents collected and stolen by Udy.

The prelitigation summary broke down the $130,091.20 in fraudulent charges to credit card accounts into five separate amounts specific to the following credit card accounts: Citibank, Chase Marriott, CapitalOne Visa, Amex Personal, and Zions. (This total is substantially different from the $25,102.10 found owed to the various credit card companies in the restitution order. *See supra* note 1.)

On January 27, 2014, Barnes spoke with Clayton on the phone about the claim. Western contends that Barnes told Clayton on the phone that if any losses were to be reimbursed, they had to be sustained by the P.C. The reason for Western's position was the language of the bond itself. The Bond only covers the fraudulent or dishonest "act of an employee of the Insured . . . ." Western contended that Udy was only an employee of the P.C. and consequently only the P.C. would be insured under the bond. A few months later, on March 21, 2014, Barnes once again informed Greenwald that Western was still awaiting documentation demonstrating that the P.C. incurred a loss caused by Udy.[3]

On May 29, 2014, counsel for Greenwald and the P.C., Ronald Swafford (Swafford), wrote Western, requesting a response regarding the P.C.'s claim and attached Greenwald's previous January 15, 2014, affidavit with the prelitigation summary. Barnes responded by letter on June 3, 2014, outlining the previous communications and again noting that Western still required documentation of the P.C.'s actual losses. Barnes noted that the $21,301.52 loss in checks appeared to be a loss attributable to the P.C. but noted that it was unclear who suffered

---

[3] Barnes also requested proof of Udy's conviction. On April 2, 2014, Clayton responded to Barnes that the criminal case had been postponed but that he would update Barnes as the case moved forward. The proof of criminal conviction is not an issue in this appeal. However, when Clayton responded to Western, he failed to comply with the request for documentation of the P.C.'s direct losses.

4

the $130.091.20 loss in credit card charges. Barnes concluded by again requesting documentation showing the P.C.'s actual losses.

Having received no response, Barnes again wrote Swafford on August 26, 2014, seeking the information and documentation previously requested. On December 17, 2014, Swafford responded to Western and attached Udy's Plea Agreement. It does not appear from the record that Swafford provided any documentation evidencing the P.C.'s direct loss in that correspondence. On January 5, 2015, Barnes again wrote Swafford and requested the necessary documentation. That letter reads in pertinent part:

> This bond covers loss due to an employee of Brent H. Greenwald dba Greenwald Neurosurgical only. The application states it is to cover the business of "Neurosurgery." Losses incurred involving the Allugash [sic] properties are not covered by this bond. Losses incurred to Brent Greenwald personally are also not covered. The Restitution portion of the Plea Agreement shows a loss of "$250,386.22 payable to the doctor." There is nothing that sets out exactly what portion of the loss was caused to Greenwald Neurosurgical. It appears the credit card losses were resolved by each credit card company as restitution has been awarded five companies.
>
> At this time, I request a break down as to what makes up the $250,386.22 payable to the doctor. It appears at least $140,095 is the loss regarding the Allugash [sic] properties. If the loss involves credit card companies other than the five who received restitution, please provide us with documentation showing whether those cards were personal accounts or business accounts and *whether business funds were used to pay those personal charges by Mr. Udy.* I requested this information from the accountant, Troy Clayton on January 27, 2013 [sic], but never received any documentation.
>
> Once I receive this documentation, I will proceed accordingly.

(Italics added.)

On April 17, 2015, just over four months later, Swafford wrote back to Western. Swafford failed to provide the documentation requested (although he confirmed the information regarding Udy's criminal charges), and again requested payment from Western. Subsequently, on May 15, 2015, Swafford wrote to Western's counsel, replying to a "response and explanation" that was presumably from Western but has not been included in the record. Swafford's May 15, 2015, letter stated for the first time that the P.C. took the position that the bond covered **all** of Greenwald's businesses, not just the P.C. Given the position taken, the P.C. deemed it unnecessary to provide Western with documentation demonstrating direct loss to the P.C. Swafford did not attach any substantiation of the P.C.'s losses.

5

In sum, Western asked for documentation demonstrating the P.C.'s losses as contemplated by the bond at least four times (in the phone call on January 27, 2014, and in three letters dated March 21, 2014, June 3, 2014, and January 5, 2015), each time without success. As a result, Western denied the P.C.'s claim because the P.C. had never substantiated its losses to Western's satisfaction.

**B. District court proceedings.**

Due to Western's refusal to pay under the bond, Greenwald, doing business as the P.C., filed the complaint in this action on November 5, 2015, alleging breach of contract and unjust enrichment.[4] The P.C. demanded a jury trial. On April 20, 2016, the P.C. answered Western's first set of interrogatories and requests for production of documents.

In answering discovery requests, the P.C. continued to avoid providing clear information on how the P.C. had been damaged. When asked to "itemize each element of damages . . . and state in dollars and cents the amount of money you are suing for each[,]" the P.C. answered generally that Udy had converted $275,488.32 dollars from Greenwald and his various businesses.[5] When asked to "provide an itemized list of amounts taken from accounts in the name of Greenwald's neurological practice[,]" the P.C. responded that "Udy did not withdraw any funds from any account. Matt Utdy [sic] created and submitted fraudulent invoices or charges for unauthorized payments." (While this does not appear wholly inconsistent with Ditmore's and Clayton's later accounts of Udy's actions, no invoices were produced.) Finally, when asked to produce all exhibits, the P.C. responded that "Clayton previously provided all documents and source information to Western Surety. The documents clearly verify the amounts stolen." (The district court later found that "there is nothing in the 214 pages [representing everything the P.C. provided Western in discovery] that clearly identifies any transfers wrongfully made from the P.C. account to either Allagash, Greenwald's credit accounts, or some other destination.")

On October 21, 2016, Western moved for summary judgment. Western argued that the P.C. could not recover because it failed to submit any evidence that the P.C. had sustained a

---

[4] The complaint listed the plaintiff as "BRENT H. GREENWALD dba, GREENWALD NEUROSURGICAL, P.C., An Idaho Corporation." The complaint referred to a singular plaintiff. The district court was unsure if both Greenwald and the P.C. were separate plaintiffs. Regardless, the district court ultimately found that only the P.C. was entitled to recover under the bond and noted that the parties then treated the P.C. as the only plaintiff.

[5] Coincidentally, this figure is exactly the amount of restitution ordered in Udy's criminal case; however, the amount stipulated to by Udy is owed to Greenwald personally and five credit card companies.

6

direct loss, that Udy was not acting in the regular course of his employment at a neurology practice when the loss occurred, and that the bond application omitted material information, thus precluding the P.C. from recovering. (The last of these three arguments has not been appealed.) The P.C. contested these arguments, specifically maintaining that the bond covered all of Greenwald's businesses conducted at the office. On November 30, 2016, the district court denied Western's motion for summary judgment by finding the bond was ambiguous regarding who in fact was the "insured" party.

On December 15, 2016, Western filed a motion to reconsider the November 30, 2016, order. Western contended that even if Greenwald intended to have three "insured" parties, Greenwald personally, the P.C., and Allagash, only the P.C. employed and paid Udy; therefore, it was the only entity that could recover under the bond. On January 13, 2017, the district court adopted the reasoning set forth by Western and granted its motion for reconsideration. The district court ruled that because the bond only protected against losses caused by employees who were compensated or paid by the insured, and only the P.C. had paid Udy, that only the P.C. could recover under the bond. (The P.C. has appealed this ruling.) The district court concluded that the remaining issues were whether the P.C. sustained losses as a result of Udy's actions, and if so, the amount of those losses.

As a result of the district court's narrowing of the issues, the P.C. filed its motion for summary judgment on April 25, 2017. The P.C. argued that there was no genuine issue as to the amount of loss directly sustained by the P.C. In order to support its argument, the P.C. had to finally demonstrate how the P.C. suffered losses. The P.C. attempted to accomplish this by attaching the affidavits of Ditmore and Clayton. The two affidavits were both dated January 25, 2017, twelve days after the district court's ruling that only the P.C. could recover under the bond, but not served on Western until April 25, 2017, when the P.C. filed its motion for summary judgment.

According to both Ditmore and Clayton, Udy fraudulently induced Ditmore to transfer money from the P.C.'s accounts to pay for both credit card charges made by Udy and for fraudulent Allagash expenses and debts. Both affiants claimed that the P.C. suffered $291,487.72 in damages through this deceptive practice employed by Udy. The itemized amounts of losses established by both Ditmore's and Clayton's affidavits are identical as to the amounts claimed in the prelitigation summary.

7

Each affidavit claims that $140,095.00 in "Allagash expenses and debts" were caused to be fraudulently transferred from the P.C. This is the same amount of rents stolen "[f]rom Allagash." Clayton stated that Ditmore would transfer P.C. funds for Allagash expenses "into the fraudulent Allagash account" created by Udy. In contradiction to Clayton, Ditmore stated that "the office was unaware of" the second fraudulent Allagash account created by Udy, and that she would instead deposit P.C. funds into the "valid checking accounts." Ditmore continued stating that Udy would then transfer the recently deposited P.C.'s funds from the "valid Allagash or personal account for his own personal use . . . ."

Both affidavits claim that Udy fraudulently induced Ditmore to transfer $130,091.20 in P.C. funds for Udy's fraudulent credit card expenditures. This amount is identical to the amount claimed in the prelitigation summary. Additionally, the affidavits also state that Udy stole $21,301.52 in tax payments from tenants in the Allagash properties, which was later repaid by the P.C. This is the same amount that was allegedly stolen from Idaho Spine & Brain in the form of three RehabAuthority checks, and referenced in the prelitigation summary.

Attached to Ditmore's affidavit was a ledger account of transactions for the P.C. Regarding this ledger, Ditmore stated the following: "I have reviewed the various withdrawals I made at the direction of Mr. Udy, and have attached them to this affidavit. . . . The highlighted items are the amounts Mr. Udy embezzled from Greenwald Neurosurgical, PC [sic] by his deceptive practices . . . ." However, the highlighted transactions in the ledger include only $89,000 in purportedly fraudulent transfers. No explanation is given in either affidavit as to why this amount is so much less than the $291,487.72 in purported losses incurred by the P.C. (In addition, neither affiant mentioned Udy's alleged fraudulent invoices that the P.C. claimed were "created and submitted . . . for unauthorized payments.")

In response, Western submitted an affidavit of counsel and attached a number of exhibits in an attempt to establish genuine issues of fact.

On June 30, 2017, the district court ruled in favor of the P.C. and granted its motion for summary judgment. The district court found that Udy's fraudulent conduct was covered under the bond because "moving P.C. money out of the P.C. was part of the regular service he performed for the P.C. and was part of the P.C.'s regular business." Due to the new affidavits, the district court also found that, despite the discrepancy evidenced by the transaction ledger,

8

there was no genuine issue as to whether the P.C. suffered the losses of $140,095.00 in "Allagash expenses and debts" and $130,091.20 in fraudulent credit card charges (totaling $270,186.20).

As a result, the district court granted the P.C.'s motion for summary judgment and found that the P.C. was entitled to recover the full $100,000 pursuant to the bond. On July 17, 2017, the district court entered a judgment against Western in the amount of $100,000 with interest accruing at the statutory rate. On August 29, 2017, the district court entered an amended judgment including an award of attorney's fees and costs to the P.C. Western timely appealed the district court's determination that Udy's fraudulent conduct was in the ordinary course of the P.C.'s business and the finding that no genuine issue of fact existed as to the amount of loss sustained by the P.C. The P.C. timely appealed the district court's determination that only the P.C. was covered under the bond and the award of attorney's fees it received, contending the award should have been greater.

## II. QUESTIONS PRESENTED ON APPEAL

1. Did the district court err when it concluded only the P.C. could recover under the Dishonesty Bond?
2. Did the district court err in finding Udy was acting in the ordinary course of the P.C. business?
3. Did the district court err in granting summary judgment to the P.C.?
4. Did the district court err in awarding attorney's fees to the P.C.?
5. Is the P.C. entitled to attorney's fees on appeal?

## III. STANDARD OF REVIEW

This Court employs the same standard as the district court when reviewing rulings on summary judgment motions. *La Bella Vita, LLC v. Shuler*, 158 Idaho 799, 805, 353 P.3d 420, 426 (2015) (citing *Wesco Autobody Supply, Inc. v. Ernest,* 149 Idaho 881, 890, 243 P.3d 1069, 1078 (2010)). "The court must grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." I.R.C.P. 56(a). (The more specific standards are set out in each applicable section below.)

## IV. ANALYSIS

In its cross-appeal, the P.C. disputes the district court's determination that the bond only covered losses to the P.C. Because the other issues could be rendered moot by resolution of this issue, it needs to be addressed at the outset.

**A. The district court correctly concluded that only the P.C. was an insured and the only entity that could recover under the bond.**

The district court originally denied Western's motion for summary judgment, concluding the bond was ambiguous as to the identity of the insured. Subsequently, the district court reversed that determination following Western's motion for reconsideration. The district court found that the P.C. was the only entity that could recover under the bond because it was the only entity that had employed Udy. In order for coverage to arise, Udy had to be an employee of the insured. Since the P.C. was the only employer of Udy, only the P.C. could recover under the bond.

In its cross-appeal, the P.C. argues that Greenwald was also personally insured under the bond. Greenwald contends that because the bond identified "Brent H. Greenwald dba Greenwald Neurosurgical" as the insured and the phrase "dba" does not connote a separate legal entity, they should both be named insureds. The P.C. maintains that the district court erred when it failed to construe the language of the bond against Western, the drafter of the insurance contract. This additional argument by the P.C. is based on the bond's language stating that the policy is "for any type of business[,]" and that Greenwald, a nonlawyer, relied on this language. Greenwald maintains he intended to insure all of his businesses and himself personally.[6]

In response, Western argues that Greenwald's subjective belief regarding who was covered is immaterial. Western continues that if the P.C.'s analysis of the bond's use of "dba" is correct, then only Greenwald, personally, would be covered and because Greenwald did not employ Udy, there could be no recovery under the bond. Western, for its part, has conceded that the entity insured by the bond was the P.C. in apparent acknowledgment that if the P.C. were not the insured under the bond then there would be no coverage since Udy was only employed by the P.C. Western also argues that the district court correctly determined that the P.C. was the only entity able to recover under the bond because it is uncontested that only the P.C. employed Udy;

---

[6] In his affidavit dated November 11, 2016, Greenwald stated:

> I did not purchase a dishonesty policy through the business corporate name, Greenwald Neurosurgical P.A., [sic] The policy was intended to be purchased in my name personally for all of my professional and business activities. The policy was not purchased under the corporate name. . . .

Greenwald continues to object to the district court's determination that *only* the P.C. has coverage under the bond because that was the only entity that employed Udy.

10

therefore, Udy could not meet the bond's definition of an employee of either Allagash or Greenwald personally.

"[W]hen reviewing a trial court's decision to grant or deny a motion for reconsideration, this Court utilizes the same standard of review used by the lower court in deciding the motion for reconsideration." *Fragnella v. Petrovich*, 153 Idaho 266, 276, 281 P.3d 103, 113 (2012). "When deciding the motion for reconsideration, the district court must apply the same standard of review that the court applied when deciding the original order that is being reconsidered." *Id.*

Here, like *Fragnella*, "the trial court was asked to reconsider the granting of a motion for summary judgment, so the summary judgment standard applied both to the trial court deciding the motion for reconsideration and to our review of that decision on appeal." *Id.* As such, "this Court must determine whether the evidence presented a genuine issue of material fact to defeat summary judgment." [7] *Id.*

This Court interprets insurance policies using "the general rules of contract law subject to certain special canons of construction." *Armstrong v. Farmers Ins. Co. of Idaho*, 147 Idaho 67, 69, 205 P.3d 1203, 1205 (2009) (quoting *Arreguin v. Farmers Ins. Co. of Idaho,* 145 Idaho 459, 461, 180 P.3d 498, 500 (2008)). "Whether an insurance policy is ambiguous is a question of law over which this Court exercises free review." *Id.* (citing *Purvis v. Progressive Cas. Ins. Co.,* 142 Idaho 213, 216, 127 P.3d 116, 119 (2005)).

Interpretation of a contract begins with the document's language. *Potlatch Educ. Ass'n v. Potlatch Sch. Dist. No. 285*, 148 Idaho 630, 633, 226 P.3d 1277, 1280 (2010) (citing *Cristo Viene Pentecostal Church v. Paz,* 144 Idaho 304, 308, 160 P.3d 743, 747 (2007)). "The parties' intent should be ascertained from the contract's language." *Hap Taylor & Sons, Inc. v. Summerwind Partners, LLC*, 157 Idaho 600, 610, 338 P.3d 1204, 1214 (2014) (citation omitted). "If there are two different reasonable interpretations of the contract's language, a contract is ambiguous." *Id.* "[I]nterpreting an ambiguous term is an issue of fact." *Potlatch Educ. Ass'n*, 148 Idaho at 633, 226 P.3d at 1280 (citation omitted). However, if this Court finds an ambiguity in an

---

[7] As an aside, the district court identified an incorrect standard that "[a] decision to grant or deny a motion for reconsideration generally rests in the sound discretion of the trial court." (citing *Spur Prods. Corp. v. Stoel Rives LLP*, 143 Idaho 812, 153 P.3d 1158 (2007)). This incorrect standard does not alter the fact that the district court correctly determined that only the P.C. could recover under the bond.

insurance policy, that ambiguity "must be construed most strongly against the insurer." *Armstrong*, 147 Idaho at 70, 205 P.3d at 1206 (citation omitted).

"Interpreting an unambiguous contract . . . is an issue of law subject to free review." *Potlatch Educ. Ass'n*, 148 Idaho at 633, 226 P.3d at 1280 (citation omitted).

> Where policy language is found to be unambiguous, this Court is to construe the [insurance] policy as written, and the Court by construction cannot create a liability not assumed by the insurer nor make a new contract for the parties, or one different from that plainly intended, nor add words to the contract of insurance to either create or avoid liability. Unless contrary intent is shown, common, non-technical words are given the meaning applied by laymen in daily usage—as opposed to the meaning derived from legal usage—in order to effectuate the intent of the parties.

*Armstrong*, 147 Idaho at 69, 205 P.3d at 1205 (quotations and citations omitted). "A party's subjective, undisclosed intent is immaterial to the interpretation of a contract." *J.R. Simplot Co. v. Bosen*, 144 Idaho 611, 614, 167 P.3d 748, 751 (2006).

> [S]ummary judgment is appropriate only when the district court finds the contract language unambiguous as a matter of law. *Campagna v. Parker,* 116 Idaho 734, 737, 779 P.2d 409, 412 (1989). If relevant terms are ambiguous, it is the finder of fact's role to determine the meaning of those ambiguous terms, and summary judgment must be denied if there are disputed issues of fact regarding the meaning of the ambiguous contract language. *Id.*

*Hap Taylor & Sons, Inc.*, 157 Idaho at 610, 338 P.3d at 1214.

Here, the bond unambiguously defines "employee," and, in turn, that definition clearly establishes the P.C. as the "Insured" under the bond as a matter of law. The bond defines "employee" as follows:

> [O]ne or more of the natural persons . . . while in the regular service of the Insured in the ordinary course of the Insured's business during the term of this bond, and who the Insured compensates by salary, or wages and has the right to govern and direct in the performance of such service . . . .

The bond further indemnifies the "Insured" "against any loss of money or other property which the Insured shall sustain . . . through any fraudulent or dishonest act or acts committed by any Employee or Employees of the Insured . . . ." There is no ambiguity regarding the policy's requirement that for coverage to arise, the employee must be paid by the insured. Therefore, only an entity injured by someone who is paid by that entity may recover under the bond. It is undisputed that the P.C. is the only entity to have compensated Udy. Thus, Udy was an employee

12

of the P.C. As a result, only the P.C. may recover under the bond. Consequently, the district court did not err in concluding that "only the P.C. would be entitled to recover under the Bond."

Thus, there is no need to analyze the use of the phrase "dba," nor is there any relevant ambiguity that must be construed against the insurer as the P.C. contends. Greenwald has attempted to inject his thought process into his purchase of insurance. In so doing, however, he wants to procure insurance for himself, personally, and other businesses he owns, including the P.C. and Allagash. As the standard above makes clear, Greenwald's subjective intent is immaterial. As a result, the district court correctly determined that only the P.C. can recover under the bond as a matter of law.

## B. The P.C. may only recover losses it sustained that were caused by Udy while he was acting in the ordinary course of the P.C.'s business.

Western appeals from the district court's decision that Udy was acting within the "ordinary course of business" for the P.C. Because Western's argument regarding this issue is potentially dispositive, it will also be dealt with at an early juncture. The district court rejected Western's argument that Udy did not fit the bond's definition of an employee because his fraudulent actions were not in the ordinary course of the P.C.'s business. The district court reasoned that Udy's employment as a financial manager included moving money from the P.C. to various accounts and paying creditors; therefore, by directing money out of the P.C., Udy was acting within the scope of his employment. As a result of this conclusion, the district court ruled the P.C. could recover losses it sustained because of Udy's actions.

On appeal, Western contends that there are disputed issues of fact regarding whether Udy's fraudulent actions were performed "in the ordinary course of the Insured's business." Western posits it did not insure a hybrid employee who actually performed duties for three separate and distinct entities. Western further maintains that the business of "a neurosurgical practice is not to provide a 'personal assistant' to its owner, or to provide employees to a separate real estate company." Thus, Western argues that any acts undertaken by Udy in his capacity as an employee for the other entities would not be covered by the bond.

Western admits that businesses of all kinds transfer money to other parties but argues that there are two factors which distinguish this case from a normal case where an employee might transfer money. Western argues that Udy's conduct directing money out of the P.C. was, contrary to what the district court held, not part of the regular service performed for an employer

because of the following reasons: First, the third parties were not simple creditors but instead supervising entities of Udy. As such, Udy was purportedly inducing Ditmore to transfer money for the benefit of Allagash and Greenwald personally, not for the benefit of the P.C. Second, Western contends that Udy had no direct authorization to transfer the P.C.'s funds; he had to induce Ditmore to transfer the funds. Thus, such transfers were arguably outside the "ordinary course" of his employment. Western asserts that the act of directing such transfers was actually in the course of his employment for Greenwald and Allagash, not the P.C. It was Ditmore, not Udy, who could transfer the P.C.'s funds in the ordinary course of her employment with the P.C.

In response, the P.C. states that Ditmore's affidavit shows Udy's responsibilities included directing the P.C.'s funds. The P.C. concedes that Udy did not have the actual ability to transfer the P.C.'s funds but contends that he had the authority to request the transfers of the P.C.'s funds, which he did through Ditmore.

The P.C. also argues that Western admitted that Udy was an employee of the P.C. and judicial estoppel bars Western from now contending otherwise. The P.C. next argues that it is undisputed that Udy was an employee of the P.C., as it is uncontested that the P.C. paid Udy.[8]

The P.C. further maintains that the district court correctly determined that Udy was acting in the ordinary course of the P.C.'s business when he defrauded it. Udy's responsibilities included the ability to direct the transfer of money. Consequently, what happened after the money was transferred and to whom the money was transferred is immaterial. The P.C. concludes by arguing that Western's interpretation would render an illogical result by barring recovery from an employee's fraudulent actions who was engaged in "secretarial work, client interaction, phone calls or other actions . . . [outside the scope of] direct neurosurgical medical actions."

These arguments will be addressed in turn.

    1.  <u>Judicial estoppel does not apply under these circumstances.</u>

Preliminarily, judicial estoppel does not bar this issue. "Judicial estoppel is applied when a litigant obtains a judgment, advantage, or consideration from one party, through means of

---

[8] The P.C. also argues that Western failed to appeal and seek review of the district court's January 13, 2017, order granting the motion for reconsideration that found Udy was an employee of the P.C. This argument is misplaced. Although the district court concluded that "Udy was an employee of the P.C.," this refers to the issue regarding the P.C. compensating Udy, a separate element of the definition of employee. In the district court's later order, it recognized three separate elements of the definition of employee, and directly ruled on the element of whether Udy's conduct was in the ordinary course of the P.C.'s business—the element now being appealed.

14

sworn statements, and subsequently adopts inconsistent and contrary allegations or testimony to obtain a recovery or a right against another party, arising out of the same transaction or subject matter." *Heinze v. Bauer*, 145 Idaho 232, 240, 178 P.3d 597, 605 (2008) (citation omitted).

In this case, Western argued, "Mr. Udy does not meet the bond's definition of an employee for any entity other than the neurosurgical practice, because only the neurosurgical practice paid him a salary or wages[;]" this argument regards the compensation element of "employee" under the bond. Western never admitted or conceded that Udy acted in "the ordinary course of the insured's business," a separate element of "employee" under the bond. Thus, Western's later position claiming Udy did not act in the ordinary course of the P.C.'s business is not inconsistent. As a result, judicial estoppel does not bar Western from arguing that Udy was not acting in the ordinary course of the P.C.'s business.

2. Whether Udy was acting in the "ordinary course of [the P.C.'s] business" is a jury question.

The standards regarding insurance policies, contracts, and summary judgment also apply to this issue. However, a few standards warrant repeating. When an insurance policy is found to be unambiguous, courts cannot by construction "create a liability not assumed by the insurer . . . ." *Armstrong*, 147 Idaho at 69, 205 P.3d at 1206 (citation omitted).

This Court exercises free review over whether an insurance policy is ambiguous. *Armstrong*, 147 Idaho at 69, 205 P.3d at 1206. "An insurance policy will be found ambiguous if it is reasonably subject to conflicting interpretations." *Howard v. Oregon Mut. Ins. Co.*, 137 Idaho 214, 218, 46 P.3d 510, 514 (2002).

"In determining whether a particular provision is ambiguous, the provision must be read within the context in which it occurs in the policy." *Armstrong*, 147 Idaho at 69–70, 205 P.3d at 1205–06. Here, the context demonstrates that the definition of employee is designed to limit the scope of the insurer's liability. As such, "[a] provision that seeks to exclude the insurer's coverage must be strictly construed in favor of the insured. . . . The burden is on the insurer to use clear and precise language if it wishes to restrict the scope of its coverage." *Arreguin*, 145 Idaho at 461, 180 P.3d at 500.

The outcome of this issue depends on whether or not the bond's language requiring an employee to be "in the regular service of the Insured *in the ordinary course of the Insured's business*" is ambiguous. (Italics added.) As established, the P.C. is the only insured entity that

15

can recover under the bond. The P.C.'s articles of incorporation establish it as a for-profit company with the purpose of "conduct[ing] a medical practice of neurosurgery." As a starting point, Black's Law Dictionary defines "course of business" ("also termed *ordinary course of business*") as "[t]he normal routine in managing a trade or business." *Black's Law Dictionary* (10th ed. 2014) (italics in original). Given this, the ordinary course of the P.C.'s business includes all the activities needed to operate and maintain a profitable medical practice.

We do not find the phrase "in the ordinary course of the insured's business" to be ambiguous. We think a jury is capable of applying this phrase in the context of this litigation.

As will be discussed, there is a genuine issue of material fact regarding the amount of losses actually sustained by the P.C. as a result of Udy's actions. In addition, we think the district court erred when it concluded, "[t]here is no reason why losses once accurately attributable to Allagash and/or Dr. Greenwald personally cannot be traced to losses originally sustained by the P.C." For instance, it does not appear that Udy's theft of rent checks and property taxes for Allagash rental property had anything to do with the P.C. If the P.C. later decided to reimburse Allagash for those losses, that would not be a loss attributable to the P.C. absent additional facts not evident in this record. Consequently, a determination that the $140,095 loss "From Allagash" was either sustained by the P.C. or that it was traceable to the P.C. is not supported by the record. The P.C. cannot unilaterally decide to reimburse losses to other entities, which in turn transmogrifies those losses into losses of the P.C. Whether this occurred or to what extent it occurred is a question of fact for the factfinder to resolve.

To recap, the P.C. is the only employer of Udy and therefore the only entity that can recover under the policy. To the extent Udy was acting in the ordinary course of business for the P.C., Western has an obligation to indemnify the P.C. for those losses. However, for that contractual obligation to indemnify to arise, the P.C. must prove Udy's actions were within the ordinary course of the P.C.'s business. Neither Greenwald personally nor Allagash may recover under the bond for Udy's conduct.

## C. A genuine issue of fact exists regarding the amount of losses sustained by the P.C.

Western next contends that there is a genuine issue of fact regarding the amount of losses the P.C. sustained. Western further argues that the P.C. failed to shift the burden of proof in the summary judgment stage because the later affidavits still contained disputed issues of fact. In

response, the P.C. maintains that Ditmore's and Clayton's affidavits foreclose any genuine issue of material fact and properly allowed the district court to grant summary judgment.

We begin our analysis by being mindful of the proposition that "[a]ll reasonable inferences that can be drawn from the record are to be drawn in favor of the nonmoving party, and disputed facts are liberally construed in the nonmoving party's favor." *Marek v. Hecla, Ltd.*, 161 Idaho 211, 214, 384 P.3d 975, 978 (2016) (citing *Mackay v. Four Rivers Packing Co.*, 145 Idaho 408, 410, 179 P.3d 1064, 1066 (2008)). "All doubts are to be resolved against the moving party." *Callies v. O'Neal*, 147 Idaho 841, 846, 216 P.3d 130, 135 (2009) (citing *Collord v. Cooley,* 92 Idaho 789, 795, 451 P.2d 535, 541 (1969)).

> The burden of proving the absence of material facts is upon the moving party. Once the moving party establishes the absence of a genuine issue, the burden shifts to the nonmoving party to show that a genuine issue of material fact on the challenged element of the claim does exist.

*Venable v. Internet Auto Rent & Sales, Inc.*, 156 Idaho 574, 581, 329 P.3d 356, 363 (2014) (quoting *Hei v. Holzer,* 139 Idaho 81, 85, 73 P.3d 94, 98 (2003) (internal citations omitted)).

"A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, . . . or [by] showing that the materials cited do not establish the absence . . . of a genuine dispute . . . ." I.R.C.P. 56(c)(1). Thus, "the party opposing summary judgment must bring to the trial court's attention evidence that may create a genuine issue of material fact . . . ." *Beus v. Beus*, 151 Idaho 235, 239, 254 P.3d 1231, 1235 (2011) (citing *Esser Electric v. Lost River Ballistics Tech., Inc.,* 145 Idaho 912, 919, 188 P.3d 854, 861 (2008)). "When considering evidence presented in support of or opposition to a motion for summary judgment, a court can only consider material which would be admissible at trial." *Venable*, 156 Idaho at 580, 329 P.3d at 362 (quoting *Gem State Ins. Co. v. Hutchison,* 145 Idaho 10, 14, 175 P.3d 172, 176 (2007)).

> Given these standards, summary judgment is improper "if reasonable persons could reach differing conclusions or draw conflicting inferences from the evidence presented." *McPheters v. Maile,* 138 Idaho 391, 394, 64 P.3d 317, 320 (2003). However, a "mere scintilla of evidence or only slight doubt as to the facts is not sufficient to create a genuine issue of material fact for the purposes of summary judgment." *Van v. Portneuf Med. Ctr.,* 147 Idaho 552, 556, 212 P.3d 982, 986 (2009).

*La Bella Vita, LLC v. Shuler*, 158 Idaho 799, 805, 353 P.3d 420, 426 (2015).

Given the standards set out above and construing the inferences in favor of Western, as we are obliged to do, we conclude that genuine issues of material fact exist regarding the amount of losses sustained by the P.C.

A review of the record discloses a litany of unresolved questions of fact remaining.

First, during discovery, the P.C. claimed that Udy created and submitted fraudulent invoices. However, no invoices were ever produced, and Ditmore, who claims Udy induced her to transfer money, gave a detailed account of Udy's actions which did not include any mention of fraudulent invoices.

Second, no explanation was given by Ditmore or Clayton as to why Ditmore's attached ledger only accounts for $89,000 dollars in losses, instead of the $291,487.72 both affidavits state was taken from the P.C. (In order to issue a judgment for $100,000, the P.C. had to clearly establish a loss of at least that sum. This affidavit does not support entry of a judgment for $100,000.)

Third, Clayton's and Ditmore's stories differ regarding how Ditmore transferred money at Udy's request. Clayton stated that Ditmore would transfer P.C. funds for Allagash expenses "into the fraudulent Allagash account" created by Udy. While Ditmore stated that "the office was unaware of" the fraudulent Allagash account created by Udy, and that she would instead deposit P.C. funds into the "valid checking accounts." While this discrepancy may have an explanation, it is relevant to Udy's fraudulent scheme of transferring money, which Clayton claims to have investigated and deciphered, and is relevant to the affiants' credibility, especially considering the other discrepancies.

Fourth, Greenwald stated in his earlier affidavit that the credit card charges were paid from "my checking accounts . . . ." This contradicts the explanation proffered by Ditmore and Clayton, that the charges were paid with the P.C.'s money. Two inferences can be drawn from this: one, that Greenwald conflated his personal accounts and the P.C.'s checking accounts; or two, that Greenwald used money from his personal accounts to reimburse the losses due to the credit card charges. Either way, the uncertainty injected does not support the decision to grant summary judgment.

Fifth, Western repeatedly asked for substantiation of the proof of loss without success. It was only after the district court decided the P.C. was the only entity that could recover under the bond that the affidavits of Ditmore and Clayton suggested that it was the P.C. that lost money as

18

a result of Udy's fraudulent activity. At a minimum, the credibility of both Ditmore and Clayton have been brought into question. In a case such as this, where credibility has been brought into question, such determinations are to be made by the factfinder at trial. *See Hilliard v. Murphy Land Co., LLC*, 158 Idaho 737, 742, 351 P.3d 1195, 1200 (2015) ("Even when an action will be tried to the court rather than to a jury, the court cannot assess credibility at the summary judgment stage when credibility can be tested in court during the trial.").

Sixth, the restitution order, entered into by Udy in his federal prosecution, obligates him to pay $250,386.22 *to the doctor* (not the P.C.) and $25,102.10 to various credit card companies. Given the restitution agreed to by Udy, it does not appear any is due the P.C., Udy's employer. If the P.C. is not entitled to any restitution, Western would not be obligated to indemnify the P.C., since it seemingly has not sustained a loss.

In addition, it appears that at first, the P.C. recognized it needed to demonstrate it had sustained direct losses, when it stated that "an employee, Matt Udy, has stolen funds *from the business*," and when it wrote "[p]lease find attached the documentation for the fraud and embezzlement perpetrated by Matthew Udy *against our company*." Then, it seems the P.C. altered its position to instead argue that Allagash and Greenwald personally were covered under the bond, once it realized it lacked evidence that the P.C. had sustained losses caused by Udy. This shift in position can be noticed in the May 15, 2015, letter, after many attempts by Western to secure evidence that the P.C. lost money—evidence the P.C. quickly produced after the ruling in which it was determined only the P.C. could recover. This multiplicity of explanations does not support the district court's conclusion that no genuine issue of material fact remained.

In conclusion, the discrepancies above demonstrate genuine issues of material fact regarding the amount of losses, sustained by the P.C., that should be determined by a jury. *See La Bella Vita*, 158 Idaho at 805, 353 P.3d at 426.

**D. The district court erred in awarding attorney's fees to the P.C.**

After judgment was entered in favor of the P.C., the P.C. requested $38,170 in attorney's fees pursuant to Idaho Code section 41-1839. However, the district court, in its discretion, only awarded $15,360. The P.C. argues in its cross-appeal that the district court abused its discretion when it failed to award the P.C. all of its requested attorney's fees.

Because we vacate the judgment entered, we likewise vacate the award of attorney's fees to the P.C. The district court's determination that the P.C. was the prevailing party was

19

premature, and consequently the award of attorney's fees predicated on that finding is vacated. *Arreguin*, 145 Idaho at 464, 180 P.3d at 503 ("To be entitled to an award of attorney fees under [Idaho Code section 41-1839], the insured must prevail.").

**E.  The P.C. is not entitled to attorney's fees on appeal.**

The P.C. requests attorney's fees on appeal based on Idaho Code section 12-121 and section 41-1839. Section 41-1839 provides that it and "section 12-123, Idaho Code, shall provide the exclusive remedy for the award of statutory attorney's fees in all actions or arbitrations between insureds and insurers involving disputes arising under policies of insurance." As a result, awarding attorney's fees under Section 12-121 would be improper. In addition, in order for the P.C. to recover under Idaho Code section 41-1839 the insured must prevail. *Arreguin*, 145 Idaho at 464, 180 P.3d at 503. The P.C. did not prevail on appeal. Consequently, it is not entitled to attorney's fees.

## V.  CONCLUSION

For the foregoing reasons, the district court's order granting summary judgment is reversed and the judgment issued is vacated. The district court's award of attorney's fees to the P.C. is likewise vacated. The P.C.'s request for attorney's fees on appeal is denied. Western is awarded its costs on appeal. This case is remanded for further proceedings consistent with this decision.

Chief Justice BURDICK, Justices HORTON, BRODY, and BEVAN CONCUR.